lml

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| ) | |
| v.   ) | No.  08-40008-JAR |
| ) | |
| **ISAAC YASS and** ) | |
| **ROBERT ANDREW BLECHMAN,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

**MEMORANDUM OPINION
AND PRELIMINARY ORDER OF FORFEITURE**

On January 16, 2009, a jury found defendants Isaac Yass and Robert Blechman guilty of one count of conspiracy to commit mail fraud and aggravated identity theft in violation of 18 U.S.C. § 371, six counts of mail fraud in violation of 18 U.S.C. § 1341, and six counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A.  The First Superseding Indictment included a notice of the government's intent to seek forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).  The assets to be forfeited are identified as a money judgment equal to the amount of proceeds obtained as a result of the fraud scheme alleged in the Indictment.  Defendants did not request to have the jury hear the forfeiture allegation, and on April 22, 2009, the Court held an evidentiary hearing on the government's claim for forfeiture. The Court took the matter under advisement and granted the parties' request to file written submissions.  The Court has reviewed the record from the forfeiture hearing and the trial, as well as the parties' submissions, and grants the government's request for a Preliminary Order of Forfeiture.

**I.     Applicable Law**

The forfeiture allegation in the First Superseding Indictment states that the government seeks forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).[1] The Indictment alleges:

> 19) Upon conviction of the following offenses in violation of Title 18, United States Code, Section 1341 set forth in Counts 1 through 7 of this Indictment, the defendants, [Isaac Yass and Robert Blechman] shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(c) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses, including, but not limited to:
>
> A.    Money Judgment. A sum of money equal to the amount of proceeds obtained as a result of the fraud scheme alleged herein, for which the defendants are liable.
>
> B.    In the event any of the foregoing property: 1) cannot be located upon the exercise of due diligence; 2) is transferred, sold to, or deposited with, a third party; 3) is placed beyond the jurisdiction of the Court; 4) is substantially diminished in value; or 5) is commingled with other property which cannot be divided without difficulty, as a result of any act or omission of any defendant, the Court shall order the forfeiture of any other property of the defendants, up to the value of the property described in

---

[1] Section 2461 was enacted in 2000 as part of the Civil Asset Forfeiture Reform Act ("CAFRA"), and acts as a "gap filling" or "bridging" provision that grafts civil forfeiture provisions, like section 981, onto criminal proceedings in certain circumstances:

> If a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized, the Government may include notice of the forfeiture in the indictment or information pursuant to the Federal Rules of Criminal Procedure. If the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case pursuant to the Federal Rules of Criminal Procedure and section 3554 of title 18, United States Code. The procedures in section 413 of the Controlled Substances Act (21 U.S.C. § 853) apply to all stages of a criminal forfeiture proceeding, except that subsection (d) of such section applies only in cases in which the defendant is convicted of a violation of such Act.

28 U.S.C. § 2461(c) (2006).

paragraph 19 A. above.[2]

The Federal Rules of Criminal Procedure require that "[i]f the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense."[3] The "requisite nexus" for a violation of 18 U.S.C. § 1341 is set forth in 18 U.S.C. § 981(a)(1)(C), which subjects to civil forfeiture "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of [various sections of Title 18] or any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense." Section 1956(c)(7)(A) in turn incorporates by reference the list of RICO predicate offenses set forth in 18 U.S.C. § 1961(1). Because general mail fraud under § 1341 is a RICO predicate offense, and since those proceeds are subject to civil forfeiture, they are also subject to criminal forfeiture under 28 U.S.C. § 2461(c),[4] the relief the government requests here.[5] Sentencing courts determine the forfeiture amounts by a preponderance of the evidence.[6]

---

[2](Doc. 38.)

[3]Fed. R. Crim. P. 32.2(b)(1).

[4]*See, e.g., United States v. Jennings*, 487 F.3d 564, 585 (8th Cir. 2007) (holding that § 2461(c) allows for criminal forfeiture of the proceeds of general mail fraud); *United States v. Edelkind*, 467 F.3d 791, 799-800 (1st Cir. 2006) (same); *United States v. Vampire Nation*, 451 F.3d 189, 199-200 (3d Cir. 2006) (same).

[5]In its Brief submitted after the hearing, the government mistakenly cites 18 U.S.C. § 982(a)(3) and (4) as the basis for its forfeiture allegation (Doc. 146 at p. 9). That statute provides for forfeiture of the gross receipts obtained as the result of a conviction of money laundering or conspiracy to commit money laundering affecting a financial institution, and does not apply to this case.

[6]*Libretti v. United States*, 516 U.S. 29, 39 (1995).

**II. Evidence**

The Court has previously summarized the evidence at trial in its Memorandum and Order on defendants' post-trial motions.[7] The Court incorporates that order herein and relies upon it by reference in ruling on the instant motion. The Court will not restate its findings in detail, but will provide excerpts from the opinion as needed to frame its discussion. Highly summarized, the evidence at trial showed that defendants engaged in an unlawful scheme involving the filing of fraudulent bankruptcy petitions and unlawful fractional interest transfers, which were sent to trustees to stop lawful foreclosures by invoking the automatic stay provisions of the bankruptcy code. The evidence showed that Yass solicited home-buyers who were subject to lawful foreclosure proceedings, explaining the services that he conducted under the name "STOPCO."[8] For a monthly cash payment, Yass promised to stop a home-buyer client's foreclosure for up to two years.[9] In 2006, Blechman provided Yass with the PACER[10] internet address,[11] and Yass established an account with PACER.[12] Blechman provided Yass with specialized knowledge about bankruptcy procedures, identifying proceedings, keeping him apprised of pending motions for relief from the automatic stay, and advising him when a dismissal would take place in a

---

[7](Doc. 152.)

[8]*See, e.g.*, Trial Ex. 1-NN, showing that Yass sent out more than 5000 solicitations in October 2007; Trial Ex. 1-PP, showing the service of "Stopping the Auction Sale" with a photo of Yass as a principle in Stopco.

[9]Trial Ex. 1-VVV.

[10]PACER is the acronym for the Public Access to Court Electronic Records. Trial Ex. 1-RR.

[11]Trial Ex. 1-FFF.

[12]*See, e.g.*, Trial Exs. 1-SS and 1-UU showing Yass's account ISO725 at PACER.

case.[13] He advised Yass on when to date an assignment of a deed, which address to use on a deed, and offered to review it for Yass before filing.[14] A handwriting expert also identified Blechman's handwriting on a money order purchased in the name of Charles Gibbons, which was used to open an uncharged case in Maryland.[15] Defendant Blechman's Internet Provider ("IP") address appeared on the PACER records showing that he accessed the Charles Gibbons bankruptcy on March 3, 2008, after Yass was arrested.

Yass testified at trial that Irving Cohen and Mikki Henschel assisted him with his STOPCO foreclosures, but when he became distrustful of their motives, he had Blechman fulfill their roles. Yass testified that Blechman approached him several times about assisting Yass, but that it was not until the summer of 2007 that Yass began to use Blechman. Yass admitted that Cohen and Henschel continued to work on those customers they brought to Yass, and he used the bankruptcy petitions filed by Blechman to service the new customers that Yass originated so that Cohen and Henschel could not steal them from Yass.

At the forfeiture hearing on April 22, 2009, Ed Walsh, a bankruptcy analyst with the United States Trustee's Office who testified during the trial, testified about evidence concerning Count 2 of the Indictment to show how the scheme generated fraud proceeds. Count 2 was the filing of a fraudulent Chapter 13 Bankruptcy Petition for a non-existent debtor named Marvin Earl Stevens.[16] In this fraudulent petition, the non-existent debtor claimed to have used the

---

[13]Trial Exs. 1-KKK, 1-MMM.

[14]Trial Exs. 1-HHH, 1-OOO.

[15]Trial Ex. 1-ZZ-5B.

[16]Trial Ex. 2-A.

5

following dba's in the last eight years: "MES Financial, MES Holdings and MES Properties."[17] The petition was accompanied by a money order purchased by defendant Blechman and mailed from a Los Angeles Post Office, as the filing fee.[18]

Defendants used "MES Properties" in the "Short Form Deed of Trust and Assignment of Rents" created by Blechman to unlawfully stop numerous foreclosures in California, by faxing the deed of trust to a trustee along with the notice of filing of the fraudulent bankruptcy petition.[19] Walsh testified how defendants profited from this scheme. Using one STOPCO customer, Marieta Marquez, as an example, Walsh described how the customers at STOPCO were directed to make deposits into Yass's Wells Fargo account in a configuration such that the amount of the deposit identified the address of the customer for which a foreclosure would be stopped.[20] Walsh explained how Marquez, per Yass's instructions, prepared three cash deposits that were deposited into Yass's STOPCO bank account.[21] These deposit receipts were in the amount of $1,999.46, which corresponded to Marquez's address at 17846 Tacoma Circle, Villa Park, California. Walsh testified that Marquez paid Yass these cash deposits in order to stop her foreclosure proceedings.

Walsh testified that he found these deposits on Yass's Wells Fargo monthly bank statements. The government submitted a summary of all the deposits and credits in Yass's account from May 8, 2006 to March 11, 2008, as well as detailed statements of those

---

[17] Trial Ex. 2-E.

[18] Trial Ex. 2-D.

[19] Trial Ex. 2-F, p. 004; Trial Ex. 2-H, p. 003; Trial Ex. 2-I, p. 004.

[20] Trial Ex. 1-EEE.

[21] Trial Ex. 2-O, pp. 11, 14, 17.

transactions.[22]  Walsh testified that the conduct of defendants was not limited to the six mail fraud counts charged in Counts 2 through 7 of the Indictment, which corresponded to the fraudulent bankruptcy petitions filed in Kansas with social security numbers that belonged to someone else.[23]  Walsh explained that five uncharged fraudulent bankruptcy petitions were also part of defendants' mail fraud scheme, and described their similarities to the charged bankruptcy filings.  These filings were not charged as mail fraud counts in the Indictment because they used social security numbers that had not been issued to a person, and did not fall within the category of the charged aggravated identity theft counts.  The uncharged counts were filed as pro se Chapter 13 cases, with dba's that corresponded to the petitioners' names, and were all accessed by Yass via his PACER account.  Walsh testified that two of the uncharged bankruptcy cases were successfully used to stop foreclosure proceedings in California.

Walsh also testified that his investigation indicated that defendants' scheme was not limited to Kansas, but extended to nine fraudulent filings in Maryland[24] and thirteen in Tennessee.[25]  Walsh testified that these fraudulent cases also bore similarities to the Kansas cases and the money orders that accompanied the petitions as filing fees were sent from the same Los Angeles Post Office.  Blechman's image was captured on the security video in that Post Office mailing the Charles Leonard Gibbons Maryland bankruptcy petition on January 10, 2008.  Walsh testified that one of the Tennessee bankruptcy petitions, using the name Martin Samuels, was

---

[22]Forfeiture Ex. 54-F.

[23]The Court granted defendants' motions for judgment of acquittal on the aggravated identity theft charges, Counts 8 through 13. (Doc. 152.)

[24]Forfeiture Ex. 57-F.

[25]Forfeiture Ex. 54-F.

captured on the Post Office security video being mailed by Blechman's mother, and that Blechman had accessed these bankruptcy filings via his PACER account. Finally, Walsh testified that defendants' scheme extended to eighty-nine fraudulent bankruptcy filings in California, dating back to March 2006.[26] Walsh testified that he prepared this list of cases by reviewing Yass's PACER account for every case he had accessed that had similarities to the Kansas and other cases. Walsh admitted that there were too many California cases to check with the social security administration to see if the social security numbers were false, but that he was able to otherwise verify that the names of the individual petitioners were false.

Walsh testified that all of the deposits in Yass's Wells Fargo account were in relation to STOPCO, and the account was used strictly for deposits. Yass would electronically transfer the deposits elsewhere almost instantly. Welsh confirmed the government's characterization of the total deposits from May 2006 to March 2008, in the amount of $1,994,192.10 as proceeds of defendants' fraud scheme that he had investigated.

When asked on cross-examination whether he had reason to believe defendant Blechman was responsible for any bankruptcy filings prior to August 2007, Walsh testified that he believed that Blechman was involved in the scheme as far back as March 2006, as evidenced by emails between defendants, and that lots of people, including Cohen and Henschel, were involved in the scheme, but the players changed over time. Citing Yass's "remarkably candid" testimony at trial, Walsh recounted that Blechman had been asking Yass to participate in the scheme long before Yass let him. Walsh also testified that he had the ability to cross-reference properties to particular deposits in Yass's deposit account, using the same process as he went through in

---

[26]Forfeiture Ex. 59-F.

Count 2, but that he did not attempt to do so because of time constraints. Walsh admitted that it was possible that some of the California transactions involved Cohen and Henschel, but that all of the California cases identified in Ex. 59-F were accessed via Yass's PACER account and fit the pattern of the scheme. Walsh admitted that the level of activity between Henschel and Yass is demonstrated by the emails sent by Yass to Henschel dealing with properties involved in the mail fraud scheme, which far outnumber the emails between Blechman and Yass for the same time period.[27]

## III.   Discussion

Under § 981(a)(1)(C), the government is entitled to forfeiture of funds that "constitute or [are] derived from proceeds traceable to a violation" of § 1341, or a conspiracy to commit such an offense. The government seeks a Preliminary Order of Forfeiture in the form of a money judgment against defendants in the amount of $1,994,192.10, an amount the government contends constitutes the total amount of gross receipts from defendants' scheme to commit mail fraud. This amount includes uncharged fraudulent bankruptcy filings in Kansas, Maryland, Tennessee, and California as separate executions of the scheme.[28] While defendants do not contest Yass's testimony that all of the money paid to Yass by the homeowners seeking to delay foreclosure was initially deposited into the Wells Fargo account, they argue that the proceeds from the mail fraud scheme should be limited to net profits. Defendants also argue that the scope of the forfeiture should be limited to the proceeds charged in the substantive conspiracy and mail fraud counts, that is, the fraudulent bankruptcy filings in Kansas, Maryland, and

---

[27]Trial Ex. 20; Forfeiture Exs. 3054 through 3059.

[28]Forfeiture Ex. 59.

Tennessee, and that the government failed to present any evidence at trial or the forfeiture hearing tying defendants to the California bankruptcy filings.

### A.     Proceeds

Defendant Blechman argues that "proceeds" does not mean "gross receipts," but "profits," citing the recent Supreme Court decision in *United States v. Santos*.[29]  In that case, the plurality opinion concluded that the term "proceeds" in the federal money laundering statute, 18 U.S.C. § 1956(a)(1), means "profits" rather than "receipts."[30]  Key to the Court's analysis was that the federal money laundering statute does not define "proceeds."[31]  As the Supreme Court noted, however, Congress has defined "proceeds" in the context of § 981(a) to mean either "receipts" or "profits."[32]  Section 981(a)(2)(A) defines "proceeds" in cases involving, *inter alia*, illegal services and unlawful activities, as "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to the forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense."[33]  By

---

[29]128 S. Ct. 2020 (2008).

[30]*Id*. at 2024.

[31]*Id*.  In the absence of a majority opinion, the Supreme Court has instructed that the holding of *Santos* is the "position taken by [that] member[ ] who concurred in the judgment on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977).  Thus, under the *Marks* test, the narrow holding of *Santos* is limited to the position taken by Justice Stevens— that "proceeds" means "profits" in cases in which the specified unlawful activity in a charge of money laundering is illegal gambling.  *Id*.  According to Stevens, his decision to concur in the judgment was based on two factors: (1) the lack of legislative history relevant to unlawful lottery cases and (2) the "perverse result" created by the merger problem if the "gross receipts" definition is applied to illegal gambling cases.  *Santos*, 128 S. Ct. at 2034 n.7 (Stevens, J., concurring).  Given the limited nature of the *Santos* opinion, the Court disagrees with defendant that it should be extended to the definition of proceeds in the context of § 981(a)(1)(C), particularly in light of the fact that the predicate offense for the forfeiture verdict did not involve the money laundering statute, and because Congress has defined "proceeds" with respect to that particular statute.

[32]*Id*.

[33]18 U.S.C. § 981(a)(2)(A).

10

contrast, § 981(a)(2)(B) provides that

> In cases involving lawful goods or lawful services that are sold or provided in an illegal manner, the term 'proceeds' means the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs in providing the goods or services. The claimant has the burden of proof with respect to the issue of direct costs. The direct costs shall not include any part of the overhead expenses of the entity providing the goods or services, or any part of the income taxes paid by the entity.[34]

Neither party addresses which provision applies in this case.

In *United States v. All Funds on Deposit in United Bank of Switzerland*,[35] the court held:

> "Unlawful activities" is a term of art in CAFRA, at least so far as it pertains to that "specified unlawful activity" expressly identified in [section] 981(a)(1)(C) as referring to those unlawful activities defined in 18 U.S.C. § 1956(c)(7)-a category distinguished separately from the numerous other federal criminal violations referenced elsewhere in [section] 981(a)(1)(C). With respect to these unlawful activities . . , the definition of the forfeitable proceeds is solely provided by [section] 981(a)(2)(A), and not in any respect by [section] 981(a)(2)(B), as shown by the fact that, whereas the latter refers to cases involving "lawful goods or lawful services," the former applies to cases involving "illegal goods, illegal services, [or] unlawful activities. . . ."[36]

The forfeiture in this case is predicated upon convictions of the "specified unlawful activity" of mail fraud, 18 U.S.C. § 1341.[37] The Court finds that the mail fraud and conspiracy to commit

---

[34]18 U.S.C. § 981(a)(2)(B).

[35]188 F. Supp. 2d 407 (S.D.N.Y. 2002).

[36]*Id.* at 410. *Contra United States v. Kalish*, No. 06-CR-656 (RPP), 2009 WL 130215, at *7-8 (S.D.N.Y. Jan. 13, 2009) (disagreeing with the *All Funds* court's reading of § 981(a)(2)(A)).

[37]*See* 18 U.S.C. §§ 1956(c)(7), 1961(1).

mail fraud crimes are "unlawful activities," as defined by 18 U.S.C. §§ 1956(c)(7), 1961(1).[38]

Thus, with respect to forfeiture of fraud proceeds under § 981(a)(1), a defendant may be ordered to forfeit all monies received as a result of the fraud, regardless of his net profits from the scheme.[39] In other words, "[p]roceeds are property that a person would not have but for the criminal offense. . . ."[40]

### B.  Scope of Forfeiture

Under § 981(a)(1)(c), the government is entitled to forfeiture of funds that "constitute[ ] or [are] derived from proceeds traceable to a violation" of § 1341 or a conspiracy to commit that offense. The violation on which the forfeiture is based must be the specific violations of which defendants were convicted.[41] As the Second Circuit explained,

> Requiring the government to link assets to specific crimes of conviction is not only consistent with the punitive purposes of criminal forfeiture, *see Libretti*, 516 U.S. at 39-40, but also implements Congress's intent in enacting CAFRA. The legislative history of that Act suggests that § 2461(c) was designed to prevent abuse of the civil forfeiture process in part by encouraging the government to seek forfeiture through criminal proceedings, where it would have to link targeted property to a specific criminal conviction. *See* H.R. Rep. 106-192, at 8 (1999) (describing perceived abuses of civil forfeiture process, which were possible in part because government could seize property without linking it to

---

[38]*See United States v. Schlesinger*, 261 Fed. App'x 355, 361 (2d Cir. 2008) (applying § 981(a)(2)(A) to mail and wire fraud crimes); *United States v. Warshak*, No. 06-CR-00111, 2008 WL 2705044, at *4 (S.D. Ohio, July 8, 2008) (consumer fraud scheme); *United States v. Nacchio*, No. 05-CR-00545-EWN, 2007 WL 2221437, at *4 (D. Colo. July 27, 2007) (securities fraud scheme).

[39]*See, e.g.*, *United States v. Uddin*, 551 F.3d 176, 181 (2d Cir. 2009).

[40]*United States v. Nicolo*, 597 F. Supp. 2d 342, 346 (W.D.N.Y. 2009) (citations omitted).

[41]*United States v. Capoccia*, 503 F.3d 103, 116 (2d Cir. 2007); *see* 18 U.S.C. § 981(a)(2)(A) (defining "proceeds" as "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto"); 28 U.S.C. § 2461(c) (providing for forfeiture in connection with a "violation" with which a person "is charged in an indictment or information," upon "conviction" for that violation).

12

> a criminal conviction); 146 Cong. Rec. S1753-02 (explaining purpose of section eventually codified at § 2461(c) (statement of Sen. Hatch); *see also* CAFRA § 16, 114 Stat. at 221 ("Encouraging Use of Criminal Forfeiture as an Alternative to Civil Forfeiture").[42]

In this case, the predicate offenses for the government's request for an order of forfeiture are convictions for a mail fraud scheme and conspiracy to commit that scheme. Courts have ordered forfeiture of property derived from uncharged and acquitted conduct that is part of the same scheme or enterprise as convicted conduct, relying on the breadth of the conduct forming the basis of the offense of conviction. For example, in *United States v. Boesen*,[43] the court ordered the defendant, who had been convicted of health care fraud, to forfeit the proceeds of "additional executions of the scheme not specifically charged as substantive counts, but which fall within the boundaries of the overall scheme."[44] In so ruling, the court noted that health care fraud is defined as the knowing and willful execution of "a scheme or artifice . . . to defraud any health care benefit program,[45] and thus "the statute criminalizes executions of the scheme; the overall scheme is thus inherently part of the offenses of which Defendant has been convicted."[46]

Like the health care fraud statute, the mail fraud statute, 18 U.S.C. § 1341, criminalizes executions of the scheme; the overall scheme is thus inherently part of the offenses of which

---

[42]*Id.*

[43]473 F. Supp. 2d 932 (S.D. Iowa 2007).

[44]*Id.* at 952.

[45]18 U.S.C. § 1347.

[46]*Boesen*, 473 F. Supp. 2d at 953(discussing scope of forfeiture in health care fraud conviction).

13

defendants have been convicted.[47]  In this case, the government chose to set forth the mail fraud scheme in the Indictment and specifically charge six separate executions of the overall scheme that corresponded with the aggravated identity theft charges.  In addition, the conspiracy charge alleges that beginning in at least 2006, defendants conspired to commit mail fraud, and that in furtherance of the conspiracy, defendants and others at their direction committed overt acts, including but not limited to the substantive mail fraud and aggravated identity theft charges.[48]

The Court concludes that the government has proven by a preponderance of the evidence the nexus between the STOPCO bank account deposits and the scheme to defraud.  The evidence at trial, supplemented by the evidence presented during the April 22, 2009 evidentiary hearing, establish that defendant Yass received more than $1.9 million in proceeds deposited by clients of STOPCO.  "Forfeitures serve a variety of purposes, but are designed primarily to confiscate property used in violation of the law, and to require disgorgement of the fruits of illegal conduct."[49]  Forfeiture of the gross proceeds of uncharged executions of the scheme that defendants were convicted of serves this purpose.  Yass admitted at trial that *all* of the deposits in the Wells Fargo account were from STOPCO customers.  Yass accessed the California cases from his PACER account, and they fit the pattern of the charged fraudulent bankruptcy filings.  Moreover, several of the California bankruptcy cases are referenced in emails between Yass and

---

[47]*See United States v. Capoccia*, 503 F.3d 103, 112-13 (2d Cir. 2007) (declining to extend scope of forfeiture where predicate offense was transport or transmission of stolen property under 18 U.S.C. § 2314, which criminalizes only individual acts of transportation or transmission, not schemes or actions taken pursuant to schemes).

[48](Doc. 38.)

[49]*United States v. Ursery*, 518 U.S. 267, 284 (1996).

Blechman.[50]

### C.     Joint and Several Liability

Clearly, Yass is responsible for the full amount of the proceeds he collected in an account established by him for that purpose.  Defendant Blechman argues that his liability for the forfeiture should be limited to thirty bankruptcy filings that occurred after August 2007, as the bulk of the proceeds are attributable to separate, more profitable conspiracies between Yass, Cohen and Henschel.  The government responds that defendants, as co-conspirators, should be jointly and severally liable for any money judgment.  A number of courts have held that co-conspirators in a criminal scheme are jointly and severally liable for all proceeds generated under a fraud scheme.[51]  Other courts require the defendant to forfeit only so much of the proceeds, not received by him, of the fraud as were foreseeable to him.[52]  Although the Tenth Circuit has not considered the question,[53] the Court agrees with the reasoning of those courts that hold the proper standard for criminal forfeiture for co-conspirators under § 981(a)(1)(C) encompasses joint and several liability for gross proceeds generated under a fraud scheme.  Thus, Blechman, as a convicted co-conspirator, is liable for all of the proceeds generated by the mail fraud

---

[50]*See* Trial Ex. 1-GGG (referencing Romanoff bankruptcy filed 3/8/2006); Trial Ex. 1-QQQ (referencing Anthony Ruenthan bankruptcy filed 9/12/2007).

[51]*See. e.g., United States v. Browne*, 505 F.3d 1229, 1280 (11th Cir. 2007) (where the court steered away from adopting a reasonably foreseeable limitation); *United States v. Spano*, 421 F.3d 599, 603 (7th Cir. 2007) (holding "the proceeds of a conspiracy are a debt owed by each of the conspirators.  It would be absurd to treat them more leniently than the law treats a lawful partnership, all of whose members are severally as well as jointly liable for the partnership's debts.").

[52]*See, e.g., United States v. Fruchter*, 411 F.3d 377, 384 (2d Cir. 2005); *United States v. Bollin*, 264 F.3d 391, 419 (4th Cir. 2001); *United States v. Corrado*, 227 F.3d 543, 558 (6th Cir. 2000); *United States v. Hurley*, 63 F.3d 1, 22 (1st Cir. 1995).

[53]*See United States v. Wilson*, 244 F.3d 1208, 1213-14 (10th Cir. 2001) (declining to consider question as challenge was unripe in case where thirteen defendants were held jointly and severally liable for forfeiting $4.25 million in drug proceeds under 21 U.S.C. § 853).

scheme.

Assuming the Tenth Circuit adopts the more restrictive approach, however, the Court finds that it was reasonably foreseeable to Blechman that Yass was generating such proceeds from the scheme. The jury convicted defendants of the conspiracy as charged, after hearing Yass's testimony about Cohen and Henschel and being instructed, *inter alia*, on the possibility and effect of multiple conspiracies.[54] The Court has upheld defendants' conspiracy and mail fraud convictions, as detailed in its Order on post-trial motions.[55] The government presented evidence that Blechman was involved in the scheme from at least 2006. Blechman provided the vehicle for the fraud, the fraudulent bankruptcy petitions, and fractional interest documents. He provided Yass with the PACER address to allow access to the Notices of Filing. He asked Yass to participate in the scheme long before Yass used him to file bankruptcy petitions, and he provided legal advice to Yass on various issues that arose as the STOPCO scheme was being executed. And, he knew that each bankruptcy was being used to stop multiple foreclosure sales. Because Blechman was aware of the scope of the scheme, its proceeds were necessarily foreseeable to him. Accordingly, the Court finds defendants are jointly and severally responsible for the entire forfeiture amount.

### D.    Setoff

Finally, the Court addresses defendant Yass's argument that any prior civil forfeiture

---

[54](Doc. 129, Instruction No. 17A.)  The jury was also instructed that once a person becomes a member of the conspiracy, he is held legally responsible for the acts of the other members of the conspiracy, even though he was not present or aware that the acts were being committed, provided the acts were committed to help advance the conspiracy and are within the reasonably foreseeable scope of the conspiracy, and that a defendant may be convicted as a conspirator even though he plays a minor part in the conspiracy. *Id.* Instruction No. 14.

[55](Doc. 152.)

should be offset against the criminal forfeiture money judgment.[56]  The Court finds that this issue is not ripe for decision, as the issue before the Court is not how much property a defendant has but with the amount of proceeds he received in connection with the commission of the scheme to defraud.[57]  Counsel are invited to renew their offset argument after the Preliminary Order of Forfeiture is entered and the forfeiture claims are finalized.

**IT IS THEREFORE ORDERED BY THE COURT** that as a result of the offense in Counts 1 through 7, for which the defendants were convicted, a Preliminary Order of Forfeiture of a money judgment in the amount of $1,994,192.10 shall be entered against defendant Isaac Yass and defendant Robert Blechman as the amount of proceeds that constitute or are derived directly or indirectly from such offense.  This judgment shall be jointly and severally imposed against defendants, Isaac Yass and Robert Blechman.

Dated:  July 14, 2009

                       S/ Julie A. Robinson
                       JULIE A. ROBINSON
                       UNITED STATES DISTRICT JUDGE

---

[56]*See United States v. Wells Fargo Cashiers Check #00619011906 in the Amount of $660,000, et al.,* Case No. 08-CV-1234-JTM (civil forfeiture of various financial accounts and instruments totaling approximately $800,000); *United States v. $49,000.00 in Purported Attorney Fees*, Case No. 09-CV-1011-JTM (forfeiture of $49,000 retainer paid to Yass's former counsel).

[57]*See United States v. Vampire Nation*, 451 F.3d 189, 201 (3d Cir. 2006) (quotation omitted).