lml

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| | ) |
| **v.** | )         **No.  08-40008-JAR** |
| | ) |
| **ISAAC YASS and** | ) |
| **ROBERT ANDREW BLECHMAN,** | ) |
| | ) |
| **Defendants.** | ) |
| _____ | ) |

**MEMORANDUM AND ORDER**

On October 19, 2009, the first half of a bifurcated sentencing hearing was held in this

matter.  As agreed by the parties, the Court heard evidence and argument on the parties'

objections to the Presentence Investigative Report ("PSIR").  The Court took the objections

under advisement, and now issues the following statement of reasons memorializing its ruling on

objections to the PSIR.

**I.      Background**

The underlying facts of this case are recited in the Court's Orders ruling on defendants'

post-trial motions with respect to both the substantive counts and forfeiture.[1]  The Court

incorporates those orders herein and relies upon them by reference in ruling on the instant

objections.  The Court will not restate its findings in detail, except as necessary to explain the

Court's ruling.  On January 16, 2009, a jury found defendants Isaac Yass and Robert Blechman

_____

[1](Docs. 152, 154.)

guilty of one count of conspiracy to commit mail fraud and aggravated identity theft in violation of 18 U.S.C. § 371, six counts of mail fraud in violation of 18 U.S.C. § 1341, and six counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A. The Court granted defendants' motions for judgment of acquittal with respect to the verdicts on aggravated identity theft, Counts 8 through 13 and conspiracy to commit aggravated identity theft, Count 1, and upheld the verdicts on the other counts.[2] The Court also entered a Preliminary Order of Forfeiture of a money judgment in the amount of $1,994,192.10, against both defendants, jointly and severally.[3]

Highly summarized, the evidence at trial showed that defendants engaged in an unlawful scheme involving the filing of fraudulent bankruptcy petitions and unlawful fractional interest transfers, which were sent to trustees to stop lawful foreclosures by invoking the automatic stay provisions of the bankruptcy code. Defendant Yass solicited home-buyers who were subject to lawful foreclosure proceedings, explaining the services that he conducted under the name "STOPCO." For a monthly cash payment, Yass promised to stop a home-buyer client's foreclosure for up to two years. Defendant Blechman provided Yass with specialized knowledge about bankruptcy procedures and assisted Yass with the scheme in various ways, including mailing fraudulent bankruptcy petitions filed by Blechman.

## II. PSIR

The base offense level is 7.[4] Both defendants received a 16-level increase for amount of

---

[2](Doc. 152.)

[3](Doc. 154.)

[4]U.S.S.G. § 2B1.1.

loss in the amount of $1,994,192.10.[5]  Probation determined that loss in this case cannot

reasonably be determined, and used gain as an alternative measure pursuant to U.S.S.G. § 2B1.1

Application Note 3(B).  Both defendants received a 2-level increase because the offense was

committed through mass marketing,[6] a 2-level increase because the offense involved a

misrepresentation or other fraudulent action during the course of a bankruptcy proceeding,[7] and a

2-level increase because the offense involved sophisticated means.[8]  Defendant Yass received a

4-level increase for his role in the offense,[9] and a 2-level increase for obstruction of justice,[10]

bringing his adjusted and total offense level to 35, criminal history category II.  Defendant

Blechman received a 2-level decrease as a minor participant role in the offense,[11] bringing his

adjusted and total offense level to 27, criminal history category I.

Both defendants and the government raise various objections to the PSIR, which the

Court discusses in turn.

### III.    Evidence

At the sentencing hearing on October 19, 2009, Ed Walsh, a bankruptcy analyst with the

United States Trustee's Office who testified during the trial and forfeiture proceedings, testified

about evidence concerning the loss amount, number of victims, use of sophisticated means and

---

[5]U.S.S.G. § 2B1.1(b)(1)(I).

[6]U.S.S.G. § 2B1.1(b)(2)(A).

[7]U.S.S.G. § 2B1.1(b)(8)(B).

[8]U.S.S.G. § 2B1.1(b)(9)(C).

[9]U.S.S.G. § 3B1.1(a).

[10]U.S.S.G. § 3C1.1.

[11]U.S.S.G. § 3B1.2(b).

defendants' respective roles in the offense. Walsh, who is a Certified Public Accountant, explained in general how a creditor would lose money on a home loan, by lending more money than a house ultimately sold for upon foreclosure, leaving a deficiency. For example, one of the exhibits to defendant Blechman's sentencing memorandum involved a property owned by Heidi Blackwood, which was sold at a foreclosure sale after she defaulted on her loan.[12] The Trustee's Deed Upon Sale indicates that the amount of unpaid debt together with costs was $732,583.35, and the amount paid by the grantee of the trustee sale was $522,750, leaving a deficiency amount of approximately $210,000. A second example is a property owned by Debbie Stevens, in which she granted a fractional interest to RPM Funding, which was the d/b/a of a fraudulent bankruptcy filing for Roy Patrick McLeary.[13] The Trustee's Deed Upon Sale indicates that the amount of unpaid debt was $525,843.03, and the amount paid by the grantee of the trustee sale was $386,325.00, leaving a deficiency amount of approximately $140,000. Walsh testified that both of these examples involved the amount of loss up to the point of the trustee's foreclosure sale. Walsh testified that additional losses could be incurred after the sale, such as attorney fees, interest accrued, appraisal fees, inspection fees, and expenses for utilities and maintenance. The final amount of loss to the lender could not be determined until the property is liquidated.

Walsh further testified that he attempted to calculate the amount of loss in this case. Walsh compiled a list of seventy-four properties that used the Kansas and Maryland bankruptcy cases to stop foreclosures, which he characterized as the "tip of the iceberg" of the bankruptcy

---

[12]Ex. BL-2.

[13]Ex. BL-4

cases used in defendants' scheme.[14]   The total amount of the balance of the loans involved in

these properties is calculated at $35,932,508.33.  Walsh also prepared an "Estimate

Calculation,"[15] in which he concludes that, of the 122 known fraudulent bankruptcy cases

involved in the scheme filed in Kansas, Maryland, Tennessee and California, twenty cases filed

in Kansas and Maryland resulted in seventy-four attempted foreclosure sale stoppages, with debt

of $35,932,508.33.  Walsh then extrapolated this amount to the 122 known cases, resulting in

463 attempted foreclosure sale stoppages, with debt of $225 million.  Walsh testified that this

estimate was low, because if the scheme worked as planned, the fraudulent bankruptcy would be

dismissed before the creditor entered an appearance, and no one would be the wiser.

        Walsh testified that he could not reasonably calculate the amount of loss to creditors as a

result of defendants' scheme, and created a "Loss Calculation" chart to look at three possible

areas of loss: expenses, time value of money, and market value of property.[16]   The estimated loss

amount for expenses, such as attorney fees, was unknown.  The time value of money, described

as a delay of one year with a 5% interest rate, was $11,250,000.  The market value of property,

which assumed that the value of the properties was equal to the debt, with a 40% reduction, was

$90,000,000.  Walsh calculated the total estimated loss as $101,250,000, with the caveat that he

was unable to calculate the exact amount of the creditors' loss because he did not know what the

properties would have sold for if the foreclosure had not been fraudulently stopped.

        Walsh took issue with defendants' theory that there cannot be a loss in this case because

---

[14]Ex. 61.

[15]Ex. 60.

[16]Ex. 62.

the fraudulent bankruptcy cases were dismissed so quickly, explaining that the scheme was designed for quick dismissals in order to utilize as many fraudulent bankruptcies as possible. When a creditor obtained *in rem* relief, the scheme was compromised, since such relief impacted any future cases involving that particular piece of property. In fact, defendant Yass often filed his own motions to dismiss the fraudulent California bankruptcies to avoid any delay that would permit creditors to become involved.[17]

On cross-examination, Walsh conceded that he had not reviewed the history of the seventy-four individual properties identified in Exhibit 60, including what happened after Yass faxed the documents necessary to stop the trustee sale, "because it wouldn't serve my purpose," since he could not determine what the property would have sold for if there had been no delay. Walsh agreed that if there was no delay, there was no loss, and agreed that even if there was a delay in the sale, the property might sell for the same price as if there was no delay. Walsh testified that even if the sale price would have been the same had there been no delay, the delay would have caused extra expenses for the creditor, using attorney fees as an example. But, Walsh admitted that he had not determined how much lenders had paid for attorney fees, even though the amount would be set out in their motion for *in rem* relief, again "because that number wasn't going to do me any good." With respect to the impact of the depressed real estate market in California, Walsh testified that he had not consulted with an expert about how long property might take to sell or the effect of any delay on property valuation, and that his estimation was based on Yass's advertising rather than actual figures. Walsh explained that when a lender took title at a trustee sale, it would credit bid the fair market value of the property, and he had no idea

---

[17]Exs. 64, 65.

whether a particular lender had written down a loss, or even whether a homeowner remained in the property. Walsh agreed that after a homeowner received notice of trustee's sale, partial payments on the loan would not stop the foreclosure proceedings. He continued to emphasize that he could not calculate the actual loss caused by the delay because he did not know the value of the house before the homeowner started using STOPCO, but that he believed he had reasonably estimated that there was in fact a loss. When asked what the relationship was between the gain to defendants and the loss to lenders, Walsh answered that, for his purposes, "I could tell what the gain was and I couldn't tell what the loss was."

Walsh testified that the bankruptcy court also suffered both tangible and intangible losses as a result of defendants' fraudulent conduct. The intangible loss is to the bankruptcy system, which relies on full and complete disclosure. The tangible loss involves a total of $11,941.50 in unpaid Chapter 13 filing fees in Kansas, Maryland, Tennessee and California, as defendants only paid a partial fee prior to dismissal of the case.[18]

Walsh also testified regarding the number of victims in the case, which he placed into two groups: the homeowners and the lenders. Walsh cites to Inspector Barry Rausch's interview with defendant Yass, in which Yass states that he had fifty homeowner clients at any given time, and that his staff mailed out 1000 solicitations each day.[19] The search of Yass's home found $7000 worth of postage, and boxes containing thousands of magnet business cards and envelopes. Thus, it was Walsh's opinion that the number of victims in this case exceeded 250.

With respect to use of sophisticated means, Walsh testified that there was evidence that

---

[18]Exs. 55-59.

[19]Ex. 63.

the scheme was complex or intricate. Bankruptcies were filed in all three cities in the District of

Kansas, as well as multiple cities in the other states, since spreading out the filings made it more

difficult to discover and avoided *in rem* relief. Defendants chose to file Chapter 13 cases, where

the trustee would not likely review assets, and used specialized knowledge to determine the

minimum partial filing fee to avoid dismissal. Defendants used short form deeds to convey

fractional interests to fraudulent d/b/a's. They also faxed a "Notice of Filing" to the creditor to

stop the foreclosure sales, which was not entered on the docket nor readily accessible via

PACER.

Walsh testified that he believed Blechman's role in the offense was not minor, as

evidenced by several emails to Yass where Blechman explains how to file the Trustee Deed,[20]

explains bankruptcy terms[21] and provides new names of debtors/dba's to Yass.[22] Blechman also

accessed Yass's PACER account after Yass was arrested.[23]

Blechman offered relevant documents for one of the fraudulent bankruptcies filed by

defendants as an example of how to calculate loss. The fraudulent bankruptcy petition for

Patrick Roy McLeary was filed in Kansas on September 17, 2007.[24] Attorney Chelsea Herring

entered her appearance on October 1, 2007, on behalf of SBS Trust Deed Network.[25] The

Chapter 13 trustee filed a motion to dismiss the petition on October 4, 2007, and the case was

---

[20]Ex. 1-HHH.

[21]Ex. 1-KKK.

[22]Ex. 66.

[23]Ex. 21.

[24]Ex. 1-BBBB.

[25]*Id.*

dismissed on October 9, 2007.[26]  Because Yass kept records of his fraudulent transactions, the government was able to obtain copies of the five attempts to stop foreclosures based on the McLeary ("RPM") bankruptcy.  Blechman concedes that any legal fees paid to Herring are considered a loss, and can be determined by the government.  Blechman details the process of each stoppage attempt in order to demonstrate there was no further loss to the mortgage holders in any of the individual cases, either because the lender did not aggressively pursue the sale or the sale was delayed for a short time, if at all.  These five stoppage attempts are summarized as follows:

**Michelle C. Lewis**

In March 2006, Lewis obtained a loan in the amount of $508,000.[27]  The first notice of default on that loan was filed June 15, 2007, followed by notices of trustee sale on May 26 and September 18, 2007.[28]  On October 5, 2007, Lewis filed a deed conveying the property to RPM Funding for $55,000.  On October 9, 2009, the same day the bankruptcy court dismissed the McLeary case, Yass faxed to the trustee a copy of a notice of trustee sale, the deed from Lewis to RPM Funding, and evidence of the McLeary bankrutpcy.[29]  As of September 2009, Lewis remains the legal owner of the property and there has never been a trustee sale.

**Heidi Blackwood**

On September 14, 2006, Blackwood obtained a loan in the amount of $664,000.[30]  A

---

[26]*Id.*

[27]Doc. 164, Ex. 1.

[28]Ex. 1-BBBB.

[29]*Id.*

[30]Doc. 164, Ex. 2.

notice of default was sent to Blackwood on March 16, 2007, followed by a notice of trustee sale

on June 21, 2007. The sale did not proceed as scheduled on July 10, 2007.

On October 11, 2007, Blackwood deeded the property to RPM Funding for $35,000.

That same day, Yass faxed to the trustee a copy of a notice of trustee sale, the deed from

Blackwood to RPM Funding, and evidence of the McLeary bankruptcy. At that time, the

McLeary case had been dismissed for two days. The lender took title to the property on

November 14, 2007, and the property was resold on August 6, 2008.

**Debbie Stevens**

Stevens obtained a loan in the amount of $444,900 on March 29, 2006. The first notice

of trustee sale was sent on September 17, 2007. Stevens filed a deed of trust conveying the

property to RPM Funding on October 5, 2007. Yass faxed the notice of trustee sale, the deed to

RPM Funding and evidence of the McLeary bankruptcy on October 4, 2007, five days before the

bankruptcy case was dismissed. A second notice of trustee sale was filed on December 1, 2008,

with a sale scheduled for December 19, 2008. No sale occurred, and to date, Stevens remains the

owner of the property.

**Rene M. Polanco**

Polanco purported to deed the property to RPM Funding in a deed filed October 9, 2007.

He also purported to deed the same property to FM Productions the next day. A trustee sale was

scheduled for October 11, 2007, to satisfy a $61,000 loan from Dr. Fermin Alvarado. Yass faxed

the notice of trustee sale, deed from Polanco to RPM Funding, and evidence of the McLeary

bankruptcy on October 10, 2007, after the bankruptcy had been dismissed. A "trustee's deed

upon sale" was filed October 12, 2007, transferring title to Dr. Alvarado. Polanco purportedly

transferred title to Omega Associates in another deed filed November 9, 2007. On February 6, 2008, Agent Mortgage Company sought to sell the property in a trustee sale citing a first mortgage in the amount of $472,000, given to them by Polanco. A notice of trustee sale was filed on April 25, 2008, with a sale to be held on May 27, 2008. On June 18, 2008, a trustee's deed upon sale was filed indicating that Wells Fargo Bank purchased the property for $368,325, and Wells Fargo remains the owner of the property today.

**Raymond Boyce and Rita Hecker**

The homeowners were given a notice of trustee sale on July 30, 2007, with a sale date of August 16, 2007. The day before the sale, the homeowners deeded the property to MED Holdings in a deed filed on August 15, 2007, which is consistent with other deeds prepared by Yass. A second deed purporting to transfer the same property to RPM Funding was filed October 15, 2007, after the McLeary bankruptcy was dismissed. On October 17, 2007, Yass faxed the trustee a copy of a notice of trustee sale, the deed from the homeowners to RPM funding and evidence of the McLeary bankruptcy, which had been dismissed eight days earlier. The bank took title to the property on October 23, 2007, and sold the property to third parties on June 9, 2008, for an unknown price.

IV.     **Analysis**

A.      **Loss---¶ 28**

The PSIR concluded that loss could not be reasonably determined, and used an alternative measure of gain.[31] Finding gain to be the forfeiture amount of $1,994,192.10 that defendants profited as a result of their scheme, the PSIR added sixteen levels to their guideline

---

[31]U.S.S.G. § 2B1.1 cmt. n.3(B).

calculations.[32]

Guideline § 2B1.1(b)(1) states that if there is a loss that exceeds $5000, the court should increase the offense level by an amount corresponding to the applicable range of loss specified in the guideline.  The government has the burden of proving actual and intended loss by a preponderance of the evidence.[33]  "[T]he district court may increase the offense level for a defendant convicted of fraud based upon the actual financial loss caused by the defendant's fraudulent conduct or the loss intended by the defendant, whichever is greater."[34]  "Actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense."[35]  "Pecuniary harm means harm that is monetary or that otherwise is readily measurable in money," and to be reasonably foreseeable, it must be "harm that the defendant knew, or under the circumstances, reasonably should have known, was a potential result of the offense."[36]  The district court "need only make a reasonable estimate of loss."[37]  The Guidelines include a nonexhaustive list of factors a court might consider in estimating the loss, including "the approximate number of victims multiplied by the average loss to each victim," and the "reduction that resulted from the offense in the value of equity securities or other corporate assets."[38]

---

[32]U.S.S.G. § 2B1.1(b)(1)(I).

[33]*United States v. Griffith*, —F.3d—, 2009 WL 3429767, at *4 (10th Cir. Oct. 27, 2009) (citations omitted).

[34]*United States v. Galloway*, 509 F.3d 1246, 1251 (10th Cir. 2007) (citing U.S.S.G. § 2B1.1 cmt. n.3(A)).

[35]U.S.S.G. § 2B1.1, cmt. n. 3(A)(i)-(iv).

[36]*Id*. cmt. n.3(A)(iii).

[37]*Id*. cmt. n.3(C).

[38]*Id*. cmt. n.3(C)(iii)-(iv).

Application Note 3(B) to § 2B1.1(b)(2) states: "The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined."[39] The Tenth Circuit has not specifically addressed this issue under § 2B1.1, but has recently reaffirmed in cases addressing predecessor § 2F1.1,[40] that an offender's gain may be used as an "alternative estimate" only in certain circumstances.[41] As § 2B1.1 adopts the same requirements with respect to use of gain as an alternative measure of loss, those cases are instructive here. "[T]he district court must first estimate the actual and intended loss due to a defendant's fraudulent conduct, and then consider whether the defendant's gain is a reasonable estimate of the actual or intended loss."[42] However, a district court may not "simply choose to substitute gain as a measure of loss without a basis for why that substitution is reasonable."[43] In making a reasonable estimate of the loss, the district court is required to address the various amounts of loss proposed, "especially in the case of a moving target."[44] "If gain to the defendant does not correspond to any actual, intended, or probable loss, the defendant's gain is not a reasonable estimate of loss."[45]

---

[39]U.S.S.G. § 2B1.1(b)(2) cmt. n.3(B); *see United States v. Abiodun*, 536 F.3d 162, 167 n.4 (2d Cir. 2008) (explaining such a situation could arise, for example, where the government is unable to identify any victims of a fraud offense and cannot ascertain the losses they suffered).

[40]In 2001, Amendment 617 consolidated U.S.S.G. § 2F1.1 into § 2B1.1.

[41]*United States v. Gallant*, 537 F.3d 1202, 1237-38 (10th Cir. 2008) (citing *United States v.Galloway*, 509 F.3d 1246, 1250-53 (10th Cir. 2007); *United States v. Haddock*, 12 F.3d 950, 960 (10th Cir. 1993) (interpreting former § 2F1.1)).

[42]*Id*. (quoting *Galloway*, 509 F.3d at 1252 (citing *Haddock*, 12 F.3d at 961)).

[43]*Id*.

[44]*Id*.

[45]*Id*. (quoting *Haddock*, 12 F.3d at 961).

13

In *United States v. Galloway*,[46] the Tenth Circuit rejected the district court's decision-making process in calculating loss:

> Faced with ever-changing and conflicting data on the loss sustained by [the victim] as well as arguments by Mr. Galloway that [the victim] sustained no loss, the district court concluded without explanation that a loss occurred, and then determined it could not reasonably quantify the actual or intended loss. Instead, it chose to estimate the loss using Mr. Galloway's gain, the only figure not in dispute. . . . [B]efore using gain as an alternate estimate of loss, the district court must first estimate the actual and intended loss due to a defendant's fraudulent conduct, and then consider whether the defendant's gain is a reasonable estimate of the actual or intended loss. . . . [W]e are not suggesting that the district court must find the precise amount of loss, it must only make a reasonable estimate of

---

[46] 509 F.3d at 1246.

the loss. However, in
doing so, the district
court must make a
finding that addresses
the various amounts
of loss proposed,
especially in the case
of a moving target
like this one. In this
case, the proposed
amounts of loss
ranged from as low as
$0 to as high as
$122,922.29, and the
district court cannot
simply choose to
substitute a gain of
$29,359.20 as a
measure of loss
without a basis for
why that substitution
is reasonable.[47]

Per the directive of the Tenth Circuit, the Court attempts to determine the general amount

of loss attributable to defendants' scheme. The victims identified by the government as actually

suffering pecuniary harm are the mortgage holders and the bankruptcy court. With respect to the

latter, the Court finds that the government proved by a preponderance of the evidence the direct

loss of $11,941.50 from unpaid bankruptcy petition filing fees associated with the bankruptcies

filed in Kansas, Maryland, Tennessee and California. The intangible loss to the bankruptcy court,

identified by Walsh as affecting the court's ability to rely on full and complete disclosure, is not

pecuniary harm, and thus not included in the loss calculation.[48]

More problematic is the government's evidence with respect to the lenders. Of particular

---

[47]*Id*. at 1252 (citing *Haddock*, 12 F.3d at 961).

[48]U.S.S.G. § 2B1.1 cmt. n.3(A)(iii).

concern to the Court is the government's suggestion that loss can be attributed to the deficiency amounts for the properties involved in the attempted foreclosure stoppages resulting from the bankruptcy cases filed in Kansas and Maryland, and as extrapolated beyond those cases. The Court concludes that any such deficiency amounts are not properly included as loss resulting from the offense.[49] There is no evidence that these loans were fraudulently obtained. Instead, the evidence is clear that defendants targeted homeowners who had received a notice of trustee's sale. By the time defendants entered the picture, the homeowners were in default and subject to foreclosure proceedings. Defendants' scheme did not cause the homeowners to default and any resulting deficiency is not a result of the offense.[50]

The government properly focuses on the amount of loss that can be attributed to the cost of delay to the lenders, and uses extreme estimates to illustrate the difficulty in calculating this amount. Using the estimated $225 million debt amount extrapolated to 463 estimated property foreclosure stoppages, Walsh categorizes three areas of loss, with a total estimated loss exceeding $101,250,000. According to Walsh, however, the actual amount of the lenders' loss is impossible to calculate because he does not know what the properties would have sold for if the foreclosures had not been fraudulently stopped.[51] Further, even if the creditor was successful in obtaining the foreclosure, Walsh testified it would still have to contend with the eviction process,

---

[49]*Cf.* U.S.S.G. § 2B1.1 cmt. n.3(E)(ii) (directing courts to reduce the amount of loss by "the fair market value of the collateral at the time of sentencing" in cases involving collateral pledged or otherwise provided by defendant).

[50]Defendant Yass also argues that because California law provides for waiver of a deficiency judgment if a lender opts to foreclose on property held by deed of trust by way of a non-judicial foreclosure, there was no loss to the lenders. As the government points out, however, the lender may still suffer a loss in those cases, but is merely prohibited from taking or enforcing a deficiency judgment against the homeowner.

[51]Ex. 62.

which Yass also advertised he could stop.[52]  Because the government could not calculate this

actual loss amount, it used defendants' gain of $1.9 million as an alternative measure of loss.

The government presented no evidence that the lenders suffered a loss incurred by the

delay in foreclosure proceedings.  But, as Walsh admitted, such evidence is available, if difficult

to calculate.  Although the amount is attorneys fees incurred is readily determined, the

government did not present any evidence of the amount of Herring's fees, nor that of any other

counsel similarly retained by creditors.  The government's time and market value arguments

have merit only if a house scheduled for trustee sale would have sold at the same or higher price

had the lender obtained title as scheduled, instead of at a later date, after a bankruptcy case was

dismissed or relief from the automatic stay was obtained.  The government has presented no

evidence to support this conclusion.  The government did not confer with lenders about their

losses, nor consult an expert about the decline in property values in the California real estate

market in the context of the timing of the sales in this case.  In fact, the evidence in the record

indicates that the majority of these mortgages were "upside down," a likely result of sub-prime

lending, compounded by the declining housing market during this time frame.  Under these

circumstances, defendants are correct that transfer of title from a homeowner to a lender does not

necessarily bring any relief to the lender.  And, although Yass advertised he could also stop

evictions if he did not successfully stop foreclosure, there is no evidence that he did so in any of

the cases at issue.

By contrast, defendant Blechman offered evidence that there was no loss to the lenders in

any of the five properties where defendants used the McLeary bankruptcy to try to delay

_____

[52]Ex. 1-EEE.

foreclosure sales. As defendants illustrate, these records are available on each of the seventy-four properties listed by the government. Walsh testified, however, that he did not attempt to review these documents, as that "would not serve his purpose." It appears to the Court that the government could have attempted to ascertain loss by conferring with the lenders and following the paper trail. Instead, it uses estimates of loss with no evidentiary basis. With all due respect to Walsh, the Court finds that the government has confused speculation of loss with inability to reasonably determine loss. Thus, the Court is faced with no evidentiary basis for a reasonable estimate of the amount of actual loss to lenders from the delay in foreclosures caused by defendants.

The government also makes passing reference to intended loss to the creditors, citing to Yass's interview with Inspector Rauch.[53] In that interview, federal agents explained to Yass that individuals had been impacted as well as mortgage companies, using as an example a case where an individual was the mortgage holder, not a bank. The agents stated that Yass "seemed ashamed" that he had done this to individuals instead of corporations, and felt he was helping people, as many as fifty homeowners at any time, and charging up to $2000 per month. Although Yass clearly knew that his scheme would impact mortgage holders, the government does not offer any intended loss figures or calculations in support of an intended loss amount, and there is no evidentiary basis for a reasonable estimate of that amount.

With no reasonable estimate of loss to lenders, the Court turns to defendants' gain. As the Tenth Circuit made clear in *Galloway*, however, the district court may not simply choose to

---

[53]Ex. 63.

substitute gain as a measure of loss without a basis for why that substitution is reasonable.[54]   But in effect, that is what the government is asking the Court to do, as evidenced by Walsh's admission that the only relationship between gain and loss is that gain is the only number not in dispute.  Under these circumstances, the Court cannot conclude that defendants' gain constitutes an alternative measure of loss.  This case presents the unusual situation where the relationship between the defendants' gain and any loss suffered by the lenders is "at best, extremely tenuous."[55]  Here, the Court has no clear evidence of loss suffered by the lenders, with estimates of loss ranging from $101 million to $0.  A defendant's gain may only be used as a measure of loss where it is a "reasonable estimate" of loss.[56]  When a defendant's gain significantly overestimates loss, as defendants urge, or significantly underestimates loss, as the government contends, it cannot be used to calculate an enhancement.[57]

In this case, defendants earned their profits from their conspiracy and mail fraud violations when homeowner customers of STOPCO paid a fee for defendants to sell a "fake" fractional interest in their property to a company that would file bankruptcy, which deeds were used to stop lawful foreclosures by invoking the automatic stay provisions of the bankruptcy code.  Defendants were paid when the homeowners chose to spend money on fraudulent foreclosure stoppages.  The homeowners never intended to sell part of their home and never received the sum of money purportedly given for the fractional interest.  Because the fraudulent

---

[54]509 F.3d 1246, 1252 (10th Cir. 2007) (citing *Haddock*, 12 F.3d at 961).

[55]*United States v. Andersen*, 45 F.3d 217, 221-22 (7th Cir. 1995) (declining to substitute gain as measure of loss in case involving fraud on the Food and Drug Administration where defendants sold drugs that were not FDA-approved) (citing *Haddock*, 12 F.3d at 961).

[56]*See Galloway*, 509 F.3d at 1252; *Haddock*, 12 F.3d at 961.

[57]*See Gallant*, 537 F.3d at 1238-39.

filings prepared by defendants led to an automatic stay of the foreclosure proceedings on their homes, the homeowners may more appropriately be characterized as a beneficiary, rather than victim, of that fraud.[58]  Although the money paid to Yass *should* have gone to the lenders as loan payments, it does not follow that the money paid to Yass *would* have gone to the lenders as loan payments had they not engaged his fraudulent services.  The homeowners had stopped making mortgage payments long before they contacted Yass, who specifically targeted homeowners who were in default and were facing a trustee's sale.  The evidence showed the amount paid to Yass was a fraction of the amount of the homeowner's mortgage payment.  As Walsh admitted, the lender would not likely accept partial payment after the homeowner had received a notice of trustee sale.  Indeed, if partial payments could have stopped the sales, there would have been no need for the homeowners to participate in defendants' fraudulent scheme.  This is not a case where defendants' gain consists of money stolen or defrauded from homeowner victims.  In other words, defendants' gain does not represent the lenders' loss.  Because the loss to the lender victims, if any, bears no logical relationship to the fee paid by the homeowner to Yass, defendants' gain cannot be used as a substitute measure of loss.

Accordingly, defendants' objection is sustained in part.  Under U.S.S.G. § 2B1.1(b)(1)(C), the base offense level of seven is increased by four levels for loss exceeding $10,000.  This calculation applies equally to defendant Blechman, who argues that he should only be responsible for a percentage of the loss.  In determining the correct guideline range, reasonably foreseeable acts and omissions of others in furtherance of the conspiracy shall be

---

[58]*See infra* Part IV.B.

included.[59]

### B. Mass Marketing---¶ 29

Both defendants received a two-level enhancement because the offense was committed through mass marketing.  Yass objects on the ground that hand-addressing and mailing an offer of service to specific persons determined to be in need of assistance is not within the common notion of mass marketing in the 21st century.

Defendant's objection is overruled and denied.  For purposes of U.S.S.G. § 2B1.1(b)(2)(A), "mass-marketing" means a plan, program, promotion or campaign that is conducted through solicitation by telephone, mail, the Internet or other means to induce a large number of persons to purchase goods or services, participate in a contest or sweepstakes, or invest for a financial profit.[60]  Yass admitted to having his "girls" mail approximately 1000 letters a day to potential clients, which he had them hand address so they would be less likely thrown out as junk mail.  Yass's mailings were consistent with the common understanding of the term "mass marketing," and he has cited no authority to the contrary.

The government has also filed its own objection to the enhancement, arguing that defendants' total offense level should be increased by an additional four levels, because the offense involved 250 or more victims, estimating that there were 463 properties impacted by the fraud, with seventy-four of those related to fraudulent bankruptcies filed in Kansas and

---

[59]U.S.S.G. § 1B1.3(a)(1)(B).  As the Court found in its Rule 29 order, Blechman was a member of the conspiracy as charged, beginning sometime in 2006. (Doc. 152.)  As indicated in Ex. 59, the California filing fees were paid in full until approximately August 2007, when no fees were paid with the filings.

[60]U.S.S.G. § 2B1.1(b)(2)(A) cmt. n.4(A).

Maryland.[61]

The government's objection is overruled and denied. The government has the burden of proving, by a preponderance of the evidence, any findings necessary to support a sentence enhancement.[62] A four-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(2)(C) is not appropriate, as the existence of 250 victims has not been established. Specifically, the government has not established the existence of 250 distinct creditors affected by the defendants' scheme. The number of creditor victims is unknown, as 463 impacted properties does not necessarily translate to 250 more creditor victims. Large banks, like Washington Mutual, were the victim on multiple properties. In most of the seventy-four properties listed in the government's exhibit, the creditor is "unknown." Of the nineteen properties with known creditors, four creditors are the victim in multiple cases, leaving fifteen identified unique creditor victims, which falls far short of 250.

Moreover, it is not clear that individual homeowners who paid for the defendants' illegal services are properly characterized as "victims" for purposes of guideline calculations. The Guidelines state, "the term 'victim' is not intended to include indirect or secondary victims. Generally, there will be one person who is directly and most seriously affected by the offense and is therefore identifiable as the victim."[63] In this case, the creditors are the primary victims, as they were delayed in their attempts at foreclosure, which can lead to financial loss. By contrast, little is known about the hundreds of individual homeowners that paid for the

---

[61]Ex. 61.

[62]*United States v. Gamgino-Zavala*, 539 F.3d 1221, 1228 (10th Cir. 2008).

[63]U.S.S.G. § 3D1.2 cmt. n. 2.

defendants' illegal services. Indeed, the homeowners may have temporarily benefitted from the services of STOPCO. At best, these individuals are secondary victims and, as such, not properly counted as "victims" for purposes of guideline calculations. As the government has not established by a preponderance of the evidence 250 distinct victims, the enhancement pursuant to § 2B1.1(b)(2)(C) is not appropriate.

### C.      Sophisticated Means--¶ 31

Defendants object to the two-point enhancement for use of sophisticated means. The sophisticated means enhancement refers to an "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."[64] Defendants argue that the scheme was not sophisticated because Yass's actions were "painfully transparent" and did not have as a component complex or intricate steps taken to conceal or hide his activities. The scheme required nothing more than having homeowners file the fake deeds and then filling out a pro se bankruptcy petition and mailing it in. The fraud required nothing more than clerical work. According to Yass, the fake petitions were obvious fraud to anyone who took the time to look at them, which apparently no one in California bothered to do. Yass also argues that the facts only support a finding of more than ten victims, and that the inclusion of the enhancement for sophisticated means is already taken into account through the enhancement for fraud committed during the course of a bankruptcy proceeding.[65]

Defendants' objection is overruled and denied. The enhancement is appropriate because defendants' scheme required specialized knowledge of both the mortgage industry and

---

[64]U.S.S.G. § 2B1.1(b)(9) cmt. n.8(B).

[65]*See* PSIR ¶ 30.

bankruptcy procedure, as well as a grasp of how to promote and operate a small business. Indeed, the scheme appeared legitimate enough to attract hundreds of customers and operate publicly for years. Defendants' scheme required knowledge of the bankruptcy laws, proceedings and local court practices. The scheme involved the filing of 122 false bankruptcy petitions in at least four judicial districts, mass mailings to thousands of homeowners delinquent on their mortgage payments, the preparation and filing of fractional interest deeds in numerous county offices, and the faxing of these deeds along with the notice of filing to numerous creditors to stop the trustee sales. Moreover, application of the bankruptcy fraud enhancement in addition to sophisticated means is not "double counting," as the enhancements do not overlap, are distinct and do not serve identical purposes.

### D. Role in Offense---¶ 33

#### 1. Yass

Yass objects to the four-level increase for his role in the offense, arguing no significant leadership or supervisory role exists, nor are there five or more participants who are criminally responsible. He argues that the offense conduct in this case did not include a large organization and delineations between participants' leadership or supervisory roles.

Defendant's objection is overruled and denied. U.S.S.G. § 3B1.1(a) states that an aggravating role enhancement is warranted when the defendant was the organizer and leader of criminal activity that involved five or more participants or was otherwise extensive. Defendant Yass was clearly the organizer and leader in this case, as the founder and sole owner of STOPCO. All others involved in the scheme were recruited by the defendant, and he was by far the individual who profited the most from the organization. In determining whether an

organization is "otherwise extensive," all persons involved during the course of the entire offense, including unknowing outsiders, should be considered.[66] Because the scheme required the participation of clerks and staff in bankruptcy courts in at least four states, the "organization" can be considered to exist beyond co-defendant Blechman and other unindicted co-conspirators. Therefore, the four-level enhancement is appropriate.

### 2. Blechman

The PSIR includes a two-level downward adjustment because Blechman was a minor participant in the criminal activity. The government objects, arguing that this description is inaccurate. Blechman responds that he was the third person to assist Yass, who continued to use Cohen and Henschel even afer Blechman joined the conspiracy. Blechman received minimal fees for his assistance while Yass lived extravagantly on the proceeds of his fraud. The information Blechman provided Yass was general information and not provided for a fee. There are tens of thousands of emails between Yass and these three men, but only a fraction involve Blechman.

The government's objection is sustained. A minor participant is a person "who plays a part in committing the offense that makes him substantially less culpable than the average participant."[67] An example of a minor participant would be a drug mule. By contrast, Blechman, who was a paralegal, provided specialized knowledge of bankruptcy proceedings necessary for the conspiracy to prosper. Blechman provided forms and guidance to Yass during the course of the conspiracy, and purchased an completed the money orders that accompanied the fraudulent

---

[66]U.S.S.G. § 3B1.1(a) cmt. n. 3.

[67]U.S.S.G. § 3B1.1 cmt. nn.3(A), 5.

bankruptcies.  He also used Yass's PACER account after Yass had been arrested.  Therefore, the two-level downward adjustment is not appropriate.

### E.    Obstruction of Justice

#### 1.    Yass

Yass received a two-level enhancement for obstruction of justice because his testimony amounted to perjury.  Defendant argues that simply denying his guilt is not a basis for application of U.S.S.G. § 3C1.1.  Yass testified at trial for two days.  Although he was argumentative and aggressively protested his innocence, he argues that none of his testimony was shown to be false by the government.

Defendant's objection is overruled and denied.  Yass not only asserted his innocence while testifying, but went further and tried to explain his innocence by stating his belief that Blechman was buying real estate companies and putting them into bankruptcies.  Moreover, at Blechman's instruction, Yass prepared Short Form Deeds using the false company name with the property address.  Thus, Yass's assertions of innocence are belied by his testimony, and the enhancement is appropriate.

#### 2.    Blechman

Blechman's PSIR does not include an adjustment for obstruction of justice.  The government objects on the grounds that a two-level increase applies under U.S.S.G. § 3C1.1 if Blechman willfully obstructed or impeded the administration of justice, which includes providing materially false information to a probation officer in respect to a presentence or other investigation for the court.  Blechman admitted that he owns a home valued at $550,000.  It is unclear whether his ownership was disclosed on his application for court appointed counsel, and

this home has been the subject of a lawsuit, in which Blechman has thwarted the foreclosure proceedings through conveyances of title to third parties and bankruptcy filings. The government contends that Blechman also failed to disclose his true financial picture, which is relevant because he has been on notice of the forfeiture allegation since his indictment.

Blechman responds that he resides in the home, but does not own it. Title remains the subject of litigation and Blechman is not now listed as the owner of the property. He is continuing to challenge the transfer of title to another entity following a foreclosure. Blechman argues his financial affidavit submitted in support of appointment of counsel was accurate. The government cites no authority for an obstruction enhancement under these circumstances.

The government's objection is overruled and denied. Blechman's failure to disclose his complete financial situation is not significant enough to warrant a two-level increase for obstruction pursuant to U.S.S.G. § 2C1.1.

## V.    Conclusion

The Court calculates defendants' respective total offense levels as follows:

### A.    Yass

| | |
|---|---|
| Base Offense Level: | 7 |
| § 2B1.1(b)(1)(C) [loss] | 4 |
| § 2B1.1(b)(2)(A) [mass-marketing] | 2 |
| § 2B1.1(b)(8)(B) [bankruptcy] | 2 |
| § 2B1.1(b)(9)(C) [sophisticated means] | 2 |
| § 3B1.1(a) [role in offense] | 4 |
| Obstruction of Justice | 2 |

| | |
|---|---|
| **Total Offense Level** | **23** |
| **Criminal History Category** | **II** |
| **Guideline Range:** | **51-63 months** |

**B.     Blechman**

| | |
|---|---|
| Base Offense Level: | 7 |
| § 2B1.1(b)(1)(C) [loss] | 4 |
| § 2B1.1(b)(2)(A) [mass-marketing] | 2 |
| § 2B1.1(b)(8)(B) [bankruptcy] | 2 |
| § 2B1.1(b)(9)(C) [sophisticated means] | 2 |
| **Total Offense Level** | **17** |
| **Criminal History Category** | **I** |
| **Guideline Range:** | **24-30 months** |

Pursuant to the Court's Order granting defendants' request to bifurcate sentencing, a final sentencing hearing has been set for **January 4, 2010, at 9:00 a.m.**, at which time the Court will hear argument on 18 U.S.C. § 3553(a) factors and impose final sentence.  Defendants shall file their sentencing memoranda on or before **December 21, 2009**; the government shall file its response on or before **December 28, 2009**.

**IT IS SO ORDERED.**

Dated: <u>December 3, 2009</u>

<u>  S/ Julie A. Robinson             </u>
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE